Edith Miller, J.
Marie Jones was born November 17, 1965. From the time of her birth until 1968 when her mother voluntarily placed her in foster care with the Commissioner of Social Services, Marie lived off and on with her natural parents, maternal grandparents and in the homes of three other relatives. The natural mother surrendered the child for adoption in November, 1969 and the natural father surrendered the child for adoption in December, 1969.
Jewish Child Care Association is the agency responsible for the supervision of the foster care of the child and it is the agency that has been responsible for planning for the welfare of Marie during the five years she has been in foster care. Marie was placed in the foster home of Mabel and William Oliver* in 1968 *822 and has lived continuously as an integral part of the Oliver family up to the present time.
On February 15, 1973 pursuant to section 392 of the Social Services Law a hearing was scheduled to review the foster care status of Marie. Originally, no notice of the hearing had been sent to the maternal grandparents, since they had not placed the child in foster care and they had not requested that the child be discharged to their home. Therefore, pursuant to subdivision 4 of section 392, no notice was required to be given to them by statute. However, when the foster parents advised the court that the grandparents visited the child regularly, the court used its discretion to direct that notice be given to the grandparents (pursuant to Social Services Law, § 392, subd. 4, par. [e]) and the ease was adjourned for hearing to April 5, 1973. On April 5 the grandparents appeared with counsel and the court held a hearing pursuant to section 392 of the Social Services Law to adduce proof as to what is in the best interest of the child.
The court found from the uncontroverted testimony given by the foster parents that the foster father is an architect earning approximately $24,000 a year and the foster mother is primarily a housewife who occasionally works part-time in either paid or voluntary work. Marie is presently growing up in a 10-room house in Oceanside, New York and is deeply rooted in a family with an 11-year old foster sister and two older foster brothers —13 and 17 years old. She is in good health and is doing well in school. The foster parents’ expressions of love and concern for Marie are such that a de facto parent-child relationship already exists.
Inasmuch as neither parent has ever revoked his or her surrender instrument, Marie is free for adoption and it was the intention of the Legislature in enacting this legislation that adoptive homes be found for surrendered children and they not be kept in foster care status until they become adults.
As we gain insight into what is necessary to ensure the healthy emotional development of children — we have found that children? not only need homes where they will receive good physical care — they also need homes where they can develop roots and ties and that sense of security which comes from belonging to a family on a permanent basis. Therefore, the Legislature has charged the court that pursuant to section 392 (subd. 7, par. [dj) in respect to a child who has been committed to an authorized agency by a surrender instrument, that such child be placed for *823 adoption in the home of the foster family where the child resides or has resided or with any other person or persons.
The Olivers are ready, willing and able to convert their relationship with Marie into a de jure parent-child, relationship and by adoption assume all the joys and responsibilities of parenthood. The Jewish Child Care Association, based on five years of direct contacts with the foster parents and their children, with the maternal grandparents and with Marie, and based on school records, psychological records and other data, strongly recommends that the foster parents be permitted to adopt Marie, thereby providing her with a permanent parental home. The attorney for the Commissioner of Social Services has also recommended that adoption by the foster parents would be in the child’s best interest. The maternal grandparents, while strongly opposing adoption by the foster parents, have confirmed to the-court’s satisfaction that Marie has received love, care and attention from the foster parents.
At the beginning of the hearing, the grandparents did not make an application for custody or adoption but merely sought increased visitation rights. The grandparents were content to have Marie remain in foster care which, prior to the hearing, was their position.
There was a time shortly after the parents had surrendered Marie for adoption when the grandparents learned that it was the plan of the agency to have Marie adopted by the foster parents. The grandparents responded at that time by initiating a writ of habeas corpus asking for custody in order to prevent Marie from being adopted. However, inasmuch as the agency did not proceed with the adoption, the grandparents did not proceed with the writ.
Although the grandparents have been estranged from their daughter, the natural mother of Marie, for over four years, they have continued to visit their grandchild and have remained in the picture in the role of loving grandparents. However, during the course of the proceedings, the grandparents changed position and asked for Marie to be placed in their custody.
Since the Family Court has concurrent jurisdiction with the Supreme Court in respect to custody, the court seriously considered this application by the grandparents.
The grandparents testified that they lived in a one-bedroom apartment in Eiverdale. The living room is large enough so that part of the living room could be converted into a bedroom for the child. The grandmother further testified that she would be willing to give up her position in the family business and stay *824 home so that she could care for Marie. The grandparents also testified of their love for Marie which has been manifested by. their visiting their grandchild regularly and their willingness now to adopt her.
However, overshadowing this testimony was the realization by the court that this reluctant application for custody, which was being made more than two years after the grandparents have been financially able to assume responsibility for her, was a reaction to the fears of the grandparents of losing their granddaughter, a fear that loomed large inasmuch as their own daughter had not contacted them for several years.
Marie has spent the greater part of her formative years in the home of her foster parents. During this period, she has developed deep emotional ties with the foster family. Except for biology, they are her parents and their children are her sister and brothers. Her grandparents during this period have remained her grandparents. As Marie moves towards adolescence she needs the emotional commitment to her welfare that is inherent in the parent-child relationship so that limits and expectations can be set for her within, the context of familial identification and standards. Foster care at its best can never provide this for a child.
The court is cognizant of the fact that, when the natural mother placed Marie in foster care, she removed Marie from the home of the maternal grandparents. Although concededly the grandparents were undergoing financial problems which made it difficult for them to provide a stable home life for the child at the time of the .initial placement — when the parents subsequently surrendered the child for adoption — the grandparents still did not formulate any plans for discharge of the child to them. Furthermore, the natural mother, fully aware of the loving concern of her parents for the child still chose, according to the testimony of a social worker, to surrender the child to the agency for adoption by the foster parents.
In view of all the foregoing, the court finds that it is in the best interest of Marie to remain in the home of her foster parents and not to uproot her from the only stable home life she has ever known. Therefore, pursuant to section 392 (subd. 7, par. [d]) of Social Services Law, Marie is hereby placed for adoption in the foster home where she resides. Inasmuch as the foster parents in their maturity recognize the genuineness of the love and concern that the grandparents have for the child and have testified that if the court permitted Marie to be adopted they would not sever the ties of the grandparents who have con *825 sistently involved themselves with Marie in the role of grandparents— it is further ordered that upon consent of' the foster parents visitation by the grandparents be continued after the adoption proceedings are completed.

 Names are fictitious for the purposes of publication.